ROAD IMPROVEMENT DISTRICT No. 4 *v.* SOUTHERN TRUST
COMPANY.

## Opinion delivered March 13, 1922.

1. HIGHWAYS—AUTHORITY OF ROAD IMPROVEMENT DISTRICT TO BORROW
   MONEY.—Under a statute authorizing the board of commissioners of a road improvement district to borrow money at a rate of interest not exceeding 6 per cent., and to issue negotiable bonds therefor, and to pledge, assign and mortgage all assessments for the repayment thereof, the board was authorized to issue a negotiable note for borrowed money.

2. BILLS AND NOTES—NEGOTIABILITY.—A promissory note payable to a designated payee without either the words "or order," or the words "or bearer", is not negotiable.

3. HIGHWAYS—AUTHORITY OF DISTRICT TO EXECUTE NOTE.—Where the board of commissioners of a road improvement district passed a resolution authorizing its president and secretary to borrow money and execute a "note" therefor, the resolution empowered these officers to execute a negotiable note.

4. BILLS AND NOTES—WHEN NEGOTIABLE.—Where the board of commissioners of a road improvement district was impowered and intended to execute a negotiable note, but by mistake the words "or order" were omitted, but before the note was negotiated the board by letter authorized the payee to insert the omitted words, the omission was cured, and the note will be treated as a negotiable instrument.

5. BILLS AND NOTES—CONSTRUCTION WITH ANOTHER WRITING.—
   Where the commissioners of a road improvement district, in executing a note for borrowed money, by mistake omitted the words "or order", but, before the note was negotiated, by letter authorized the payee to insert the omitted words, the note and letter should be construed as parts of the same instrument.

6. BILLS AND NOTES—BONA FIDE PURCHASER.—Where the makers of a note, before its negotiators, by letter, authorized the payee to insert the omitted words "or order", so as to make the instrument negotiable, a purchaser of the note for value before maturity and with notice of the authorization, was a *bona fide* purchaser.

7. BILLS AND NOTES—WHEN NOTE NOT PAYABLE ON CONTINGENCY.—
   A note executed by the commissioners of a road improvement district "payable thirty days after date, with the express understanding and agreement that whenever the bonds of the district are sold, whether before or after maturity of the said note, the

amount owing thereon shall be deducted from the purchase price of the bonds upon the surrender of the note", was not payable upon a contingency, either as to time or manner of payment.

8.   BILLS AND NOTES—RIGHTS OF BONA FIDE PURCHASER.—Where a bank purchased a negotiable note in good faith before maturity, it acquired the instrument freed from any claims which the makers had against the payee.

9.   GARNISHMENT—PRIORITY.—Where a road improvement district, after completing the improvement, was unable to pay all of its debts, a creditor first bringing suit in equity to subject a fund in bank belonging to the district to its claim was entitled to priority over other simple contract creditors who intervened.

Appeal from Pulaski Chancery Court, *John E. Martineau,* Chancellor; affirmed.

*Powell & Allen,* for appellants, road district and National Bank of Arkansas.

Appellee is not a *bona fide* holder of the note. The note was not negotiable nor was it rendered so by the letters of Buster and Mosley.  C. & M. Dig., § 7767. The time of payment was indefinite in that it depends on the sale of the bonds to S. R. Morgan & Co., which contingency never happened.  C. & M. Dig., § 7770.  The two contemporaneous writings, *i. e.,* the resolution of the board and the note, must be construed as one and the same instrument.  8 C. J. 196; 3 R. C. L. 883; 5 Ann. Cas. 151, note; 28 Ark. 387.  The resolution provided for the payment of the note by deducting the amount from the price of the bonds.  134 Ark. 374.  The promise to pay out of a particular fund is a conditional promise which renders the note non-negotiable.  C. & M. Dig., § 7769.

The issuance of the note as drawn was authorized by the board, but the attempted change therein was only authorized by two of the three members of said board, without a regular, or specially called meeting, which could not be done.  64 Ark. 489; 64 Ark. 159; 109 Ark. 125; 110 Ark. 262; 127 Ark. 310; 89 Ark. 173; 128 Ark. 324.

The damages sustained by the district by reason of Morgan's breach of contract should be offset against the judgment against the district.

No judgment should have been rendered against the National Bank of Arkansas. The funds of the district were not subject to garnishment if the district was solvent. 230 S. W. 17.

*Caldwell, Triplett & Ross,* for other appellants.

The attempt on the part of two of the commissioners to make the note negotiable, without notice to the third member, could not bind the district. 185 S. W. 455; 110 Ark. 262.

The signatures of Buster and Mosley did not bind the district. The district's name was not signed to the note attested by them as president and secretary, and their signatures can not be held to be anything more than their individual signatures in a personal and not an official capacity, and the designation "commissioners" etc., as purely descriptive of who they are. 7 Cyc. 549, 550; 36 Ark. 293; 47 Neb. 585, 66 N. W. 649; 3 W. Va. 285; 78 Me. 390, 6 Atl. 11; 36 Ill. App. 107; 141 Mass. 587; 54 Ind. 260; 3 Wend. 94, 20 Am. Dec. 664.

Appellee should have been required to marshal the assets of Morgan it holds, before seizing the funds of the district, as otherwise these appellants, who are also claimants against the district, will be defeated in the collection of their claims. 18 R. C. L. 456.

*Carmichael & Brooks,* for appellee.

Appellee is a *bona fide* holder of the note executed by the district. 102 Ark. 451; 94 Ark. 387. The act creating the district authorized the board to borrow money on its note or bond, and it was within the power of the board to issue such note. 79 Ark. 229. The word "note" means a negotiable note. 6 Conn. 108.

The claim of want of power in two commissioners to make the note negotiable without a meeting of the board to expressly authorize this action has nothing to support

it.   91 Ark. 367; 86 Ark. 287; *Id.* 225; 74 Ark. 190; 91 Ark. 378; 89 Ark. 95.   Having accepted the benefits, the action was ratified. 98 Ark. 38.

Notes and bonds are treated as interchangeable terms.   Rapalje & Lawrence's Law Dict.   Joyce on Defenses to Commercial Paper.   §§ 394-5, 426, 441; 88 Am. St. Rep. 640.

At cause of action which may be offset against a note must exist at the giving of the note.

The district was insolvent and appellee was not required to marshal the assets.   143 Ark. 446; *Henslee* v. *Mobley,* 148 Ark. 141.

The work had been completed, and the public had no interest therein.   56 Ark. 457.   Appellee was the first creditor to bring suit, and was entitled to priority over other creditors.

WOOD, J.   Road Improvement District No. 4 of Cleveland County, Arkansas, (hereafter called district) was created and organized under act No. 618 of the General Assembly of Arkansas, 2 Road Acts of 1919, p. 2286, approved April 2, 1919.   The district was created and organized for the purpose of building a certain highway in Cleveland County, Arkansas.   E. R. Buster, T. E. Mosley and J. A. Griffin were named in the act as the board of commissioners of the district.   Under the terms of the act (section 4) the board elected E. R. Buster president and T. E. Mosley secretary and treasurer of the district.   On the 5th of May, 1919, the district entered into a contract with S. R. Morgan & Co. (owned by S. R. Morgan and hereafter for convenience called Morgan), wherein the district agreed to sell and Morgan agreed to buy bonds of the district at the price of 102 cents on the dollar.   The bonds were to bear six per cent. interest per annum, payable semi-annually, with an option to the purchaser to convert the bonds into five or five and a half per cent. bonds.   The contract, among other things, provided that Morgan should pay 15 per

cent. of the purchase money in cash upon the delivery of the bonds, and there were other provisions relating to the manner of the payment of the bonds.

Among other. provisions of the contract was one to the effect that the bonds were subject to the approval of Rose, Hemingway, Cantrell & Loughborough, attorneys of Little Rock; that the district was to adopt such resolutions and execute such pledges and other instruments, the precedent for which was to be prepared by the attorneys. The contract contained other provisions which it is unnecessary to set forth. There was a verbal understanding between Morgan and the district at the time the contract was entered into that, if the district needed funds before the bonds could be approved by Morgan's attorneys, he was to advance such funds. While the bonds were being printed, the district through its board passed resolutions, prepared by the attorneys of Morgan, setting forth that it needed cash to do the work it was authorized to do under the act incorporating it, and which resolutions, among other things, provided as follows: "Now, therefore, be it resolved, by the board of commissioners of said district, that the president of the district be authorized to borrow from the said S. R. Morgan & Company the sum of money aforesaid, and to execute to the said S. R. Morgan & Company a note in the name of the district, by him as president, to be attested by the secretary, for the sum of fourteen thousand dollars, payable thirty days after date, with the express understanding and agreement that whenever the bonds of the district are sold, whether before or after maturity of the said note, that the amount owing thereon shall be deducted from the purchase price of the bonds, upon the surrender of said note. The note to bear interest at the rate of 6 per cent. per annum from maturity."

The resolutions were adopted at a meeting of the board of commissioners of the district at which all the commissioners were present in person, and in pursuance of that resolution the following note was executed:

"Kingsland, Arkansas,
"December 15, 1919.

"$14,000.00

"Thirty days after date, for value received, the undersigned, Road Improvement District Number Four of Cleveland County, Arkansas, promises to pay to S. R. Morgan & Company at its office in Little Rock, fourteen thousand dollars ($14,000), with interest thereon from maturity until paid at the rate of six per cent. per annum.

(Signed) "Road Improvement District Number Four of Cleveland County, Arkansas.

"By E. R. Buster, President.

Attest:

(Signed) "T. E. Mosley, Secretary."

After the execution of the above note Morgan applied to the Southern Trust Company (hereafter call trust company) to borrow the sum of $14,000, offering the above note as collateral security. The trust company noticed that the note on its face was not negotiable and called Morgan's attention to that fact. Morgan directed the attention of E. R. Buster, the president of the board, to the fact that the note was not negotiable in form, and on the 18th of December, 1919, Morgan received the following letter: "Gentlemen: Referring to our note given you, amounting to $14,000 for Road Improvement District No. 4 of Cleveland County, beg to advise that we omitted in said note, to insert the words "or order", and this will be your authority to insert the words "or order" in the note.

"Yours very truly,
(Signed) "E. R. Buster,
"T. E. Mosley,

"Commissioners Road Improvement District No. 4, Cleveland County."

On the 17th of December, 1919, Mr. J. R. Vinson, the president of the trust company, wrote a letter to the commissioners of the district, saying in substance that

the trust company was loaning to Morgan the sum of $14,000 secured by the note of the district; that the note as executed on its face was not negotiable, and that a new note negotiable in form was being forwarded for their signature.    He concluded the letter by saying: "If for any reason it is not entirely agreeable with your commissioners to handle this note in the way indicated above, I would be glad for you to let us hear from you."

In reply, Vinson received the following letter:

"Dear Sir: In answer to your letter of the 17th inst. beg to advise that it will be entirely satisfactory with us to pay you the $14,000 note, transferred by S . R. Morgan & Co., provided of course you hold the note at maturity, and we are today writing S. R. Morgan & Co. to insert the words 'or order' in the note· In other words, the note should read: 'S. R. Morgan & Co. or order.'

"Yours very truly,

(Signed)    "E. R. Buster,

"T. E. Mosley,

"Commissioners Road Improvement District No. 4, Cleveland County."

There was no meeting of the board of the district at which resolutions were passed· authorizing Buster and Mosley to write the above letters.    The other commissioner, Griffin, had no knowledge of the above letters.

Upon receipt of the above letters Morgan exhibited the letter received by him to the trust company, and that company accepted the $14,000 note above set forth as collateral security on a note executed by Morgan to the trust company for that amount advanced to him. Morgan exercised his option to have the district under its contract with him issue 5 1-2 per cent. bonds· Between the time of the printing, issuance, and tender of the bonds to Morgan he had advanced to the district the sum of $14,000 less a discount of 6 per cent. per annum for thirty days and received its note therefor as above set out.    The 5 1-2 per cent. bonds were duly issued, and

about the time of the maturity of the note of the district above mentioned, these bonds were formally tendered to Morgan for acceptance, and he refused to accept the same and continued, on subsequent tenders, to refuse to take the bonds, and thereby defaulted in his contract with the district. Thereupon the district offered the bonds for sale in open market. In the meantime there had been a decline in the bond market, and the district was finally forced to sell the bonds for $106,710, which amounted to $13,367.88 less than the price which Morgan agreed to pay the district for the bonds. After the maturity of the $14,000 note executed by Morgan to the trust company, to which the $14,000 note of the district was collateral, Morgan increased his indebtedness to the trust company on the 14th of September, 1920, executing his note to the trust company in the sum of $20,000 due Nov. 1, 1920, secured by the $14,000 note of the district and by certain shares of the capital stock of the Bank of Okalona and shares of the capital stock of the Bryant Dry Goods Co. of El Dorado and other collateral. The trust company thereupon canceled the original note of Morgan to it for $14,000 and returned the same to him.

On the 22nd day of January, 1921, the trust company instituted this action in the chancery court against Morgan, the district, the National Bank of Arkansas at Pine Bluff (hereafter called National Bank), in which it prayed judgment against Morgan in the sum of $20,000 with interest, and against the district in the sum of $14,000, and against the National bank for whatever judgment might be rendered against the district, and that, if the judgment against Morgan were not paid, the other collateral, except the note of the district, be sold, and for all proper relief.

After setting up the note of Morgan and setting out the collateral, it was alleged in the complaint, among other things, that the proceeds derived from the sale of the bonds, that had been deposited in the National Bank, constituted a trust fund out of which the $14,000 note executed by the district should be paid. Morgan, in a

separate answer, virtually admitted all the allegations of the complaint.    The Bank of Okalona intervened and set up that Morgan was indebted to it in considerable sums, and it prayed that the Trust Company be required to marshal the securities of Morgan in its hands, and that the shares of the capital stock of the Bank of Okalona be resorted to last by the trust company to enforce the payment of Morgan's note.    Interventions were also filed by certain parties who alleged that they were contractors and had performed work on the road which had been completed, for which the district was due them, in the aggregate, over $26,000; that the district had raised and had on deposit in the National Bank the sum of $17,000 as a trust fund, and that the district had no other funds with which to pay the retained percentages under their contracts which were due the interveners as contractors for work on the road.    They also prayed that the trust company be required to resort to the other securities in its hands for the payment of Morgan's debt to it.

The district answered, admitting the execution of the note, but alleged that it was not authorized by the act creating the district to execute the note.    It set out the resolution under which the note was executed, and, among other things, set up that the note was not negotiable; that the trust company was not a *bona fide* holder; that it had a complete defense to the note in that Morgan had breached its contract with the district for the purchase of bonds to the damage of the district in the sum of practically the amount of the note; that the funds belonging to the district on deposit with the National Bank were funds derived from the sale of the bonds, and were no part of the proceeds of the $14,000 note issued by the district; that these funds were deposited in the bank to meet the retained percentages due the contractors; that the work for which these funds were raised had not been completed.    It denied that the funds on deposit in the National Bank were specific funds for the purpose

of paying the $14,000 obtained by the district from Morgan as evidenced by its note for that sum. The district prayed that, in the event judgment be rendered against the district on the $14,000 note, it be allowed to offset the same by its claim for damages against Morgan.

The National Bank demurred to the complaint of the trust company on the ground that it did not state a cause of action against it, and that the court had no jurisdiction over the subject-matter. There was testimony in the record to the effect that the National Bank, on the day summons was served on it, had on deposit to the credit of the district the sum of $19,755.62. The allegations of the interventions that the district had on deposit in the National Bank no other funds with which to pay their claims, or other claims, were not denied. These allegations, taken in connection with the other testimony in the case, show that the district did not have on hand sufficient funds to pay its outstanding indebtedness. These allegations of the interventions and the testimony also showed that the improvement contemplated in the creation of the road district had been finished, and that the road had been accepted by the Federal engineer, because, under the contract, the retained percentages which the interveners were claiming in payment for their work were not due, and could not be paid until the improvement had been completed.

Upon substantially the above issues and facts, the trial court rendered a decree in favor of the trust company against Morgan in the sum of $20,493.33 with interest, and a judgment against the district for $15,030.54 with interest, and against the National Bank for the same sum with interest, and directed that the trust company have execution or garnishment of the judgment against the National Bank, and that, when the judgment in favor of the trust company against the district or the National Bank is paid, the judgment against Morgan should be credited with the amount so paid. The court also rendered a decree dismissing the interventions of

the contractors without prejudice to any claims they might have against the district. From the decree the appellants prosecute this appeal.

1. The answer of the district set up that "it was not authorized to execute said note under the provisions of the act creating it." The first question therefore for our consideration is: Did the district have the power to issue the note? Section 5 of the act creating the district vests the board of commissioners named therein with power and authority, and makes it their duty, to build the road. Section 15 of the act provides in part as follows: "In order to do the work, the board may borrow money at a rate of interest not exceeding six per centum per annum, may issue negotiable bonds therefor signed by the chairman and secretary of the board, and may pledge, assign and mortgage all assessments for the repayment therefor." The resolution of the board under which the note was executed set forth that the amount was needed to do the work authorized by the act. The testimony shows that the district received the money for which the note was executed, and that same was expended in doing work for which the district was created. While the act does specify that the board may "borrow money" and may issue "negotiable bonds," yet the fact that the resolution designated the instrument to be executed for the money borrowed as, a "note," instead of a negotiable "bond", and the fact that the instrument took the form of a "note" instead of a "bond," can make no difference. Where the indebtedness which the instrument represents is for money borrowed, a technical compliance with the law as to the form of the instrument evidencing the debt, whether by negotiable note or negotiable bond, is wholly immaterial. Either would be evidence of indebtedness of the district for the money borrowed, and in the eyes of the statute "note" and "bond" would be but convertible terms. Joyce on Defenses to Commercial Paper, p. 106, § 87; 1 Rapalje & Lawrence Law Dictionary, p. 142—"Bonds

of Companies," etc.; *Manhattan Savings Inst.* v. *N. Y. National Exchange Bank,* 170 N. Y. 58, 88 Am. St. Rep. 640; see also *Arkansas Foundry Co.* v. *Stanley,* 150 Ark. 127.

2. Was the instrument under review a negotiable note? A negotiable promissory note is a written unconditional promise by one person to pay to another person therein named, or order, or bearer, a certain sum of money on demand, or at a time specified therein, or at a fixed or determinable future time. C. & M. Dig., § 7767; 3 R. C. L. p. 833 § 6, 5 Words & Phrases, 4836—"Note (In commercial Law)" and cases there cited; *Blevins* v. *Blevins,* 4 Ark. 441; *Huyck* v. *Meador,* 24 Ark. 191. The note in controversy meets all the requirements of negotiability under our negotiable instrument law, except it does not contain the words "or order" or "or bearer." Neither of these terms has been inserted in the note. Therefore the note on its face is non-negotiable. The question then arises whether or not as between the district, the maker, Morgan, the payee, and the trust company the holder, the note must be treated as a negotiable instrument. That must be considered as done which it was within the power of the parties to do and which they should have done. Under the act, as we have seen, the board had the power to borrow money and issue negotiable bonds or notes as evidence of its indebtedness. In commercial as well as common parlance, the word "note" evidencing indebtedness in a business transaction means a negotiable note. That is the well understood and general meaning of the term as defined by lexicographers, law-writers and law-makers when using the term "note" or "notes" as referring to evidence of indebtedness in business transactions.

"The term 'note' as used in the negotiable instrument law means negotiable promissory note." 5 Words & Phrases, 4837, citing the codes of several States; 1 Randolph on Commercial Paper. § 7, Promissory Notes," and definitions thereof in note; 1 Daniel on Negotiable Instruments, §§ 28; New International Dictionary, "Note" 16.

It cannot be doubted therefore that when the board of the district passed its resolution authorizing its president and secretary to borrow money from Morgan and to execute to him a "note" therefor in the name of the district, it used the word "note" in its commercial sense as meaning a negotiable instrument.    The purpose of the law-makers, of course, was to facilitate the borrowing of money by the district for making the improvement; hence, it clothed the board with the authority to issue and send into the business world "couriers without luggage"— negotiable instruments—as evidence of its indebtedness. The resolution of the board must be read in the light of the statute which was the source of its power to borrow money.    We conclude, therefore, that the resolution im-powered the president and secretary of the board to exe-cute a negotiable note to Morgan.    They failed to make the note negotiable by omitting the words "or order", but their letters unmistakably show that such was the purpose of the resolution, and such was their intention at the time the note was executed.    Having the authority to insert these words in the note by resolution of the board in the first instance, they had the power to alter or change the note in this respect without any new or additional resolution of the board.    It was a mere mistake or over-sight on their part which they had the power to correct, and the note must be treated as having been so corrected by mutual consent of the parties.    Joyce on Defense to Comercial Paper, § 135; *Camden Bank* v. *Holt,* 14 N. J. Law, 583; *Whitehead* v. *Emerick,* 87 Pa. 790. While they have not in person actually made the cor-rection, nevertheless, as between the trust company, Morgan, and the district, the letters of the president and secretary of the board must be considerd as a part of the note in the hands of the trust company.    The reso-lution of the board, the notes, and the letters of the president and secretary should be regarded as contem-poraneous writings relative to the same subject-matter and parts of the same transaction.    The note and letters

were intended to accomplish the one general object, and should be construed as parts of the same instrument. *McDonough* v. *Williams*, 77 Ark. 261-272; *Mann* v. *Urquhart*, 89 Ark. 239-247; *Richardson* v. *Thomas*, 28 Ark. 387; 8 C. J. 196, § 327; 3 R. C. L. 883.

3. Was the trust company an innocent holder of the note? Since the note on its face did not contain the words "or order", or "or bearer", it bore its own death wound as a negotiable instrument, and if the trust company had taken it in this shape without inquiry and without explanation from the president and secretary of the board as to why these words were omitted, and without their direction to insert the same as shown by their letters, of course, the trust company under such circumstances, would not be a *bona fide* holder. But, as is shown by the undisputed testimony, the trust company did make investigation and ascertained and elicited facts which rendered the note negotiable, and before the maturity thereof it advanced to Morgan the amount of money named therein. As we have shown, the only defect in the note was that it omitted the words "or order" or "or bearer" and this omission was cured by the letters signed by the president and secretary of the board, The note should therefore be read as if it contained these words. The omission of these words put the trust company upon notice. It made inquiry, and the facts developed proved that the note was executed by the president and secretary of the district in pursuance of a resolution of its board of commissioners under authority of the statute giving the commissioners the power to borrow money, and to issue "negotiable bonds" (or notes) therefor.

The resolution of the board contained a provision authorizing the president and secretary to execute a note to Morgan in the name of the district "for the sum of $14,000 payable thirty days after date, with the express understanding and agreement that whenever the bonds of the district are sold, whether before or after matur-

ity of said note, that the amount owing thereon shall be deducted from the purchase price of the bonds upon the surrender of the note.'' The appellant district contends that this provision of the resolution, of which the trust company had to take notice, shows that the note was to be paid when, and not until, the bonds of the district were sold, and that the note was payable only upon the contingency that the bonds be sold and delivered to Morgan, which contingency never happened. We cannot concur with learned counsel for appellants in this contention. Certainly the note on its face does not show that the payment thereof was to be based upon any contingency, and the note, when read in the light of that part of the resolution quoted, does not show that the note was payable upon a contingency, either as to time or manner of payment. As we construe the note in connection with the provision, there was no uncertainty in the time of payment, nor was the note payable only upon the contingency that the bonds were to be sold and delivered to Morgan. The time for the payment of the note was fixed and certain, and the note was to be paid whether any bonds were sold or not. But when the bonds were sold, whether before or after maturity of the note, if the note had not already been paid, then the amount due on the note should be deducted from the purchase price of the bonds upon the surrender of the note, no matter who purchased the bonds.

The resolution sought to provide for certain payment of the note out of the proceeds of the bond sale, but it does not justify the conclusion that the note was not to be paid unless the bonds were sold. On the contrary, it occurs to us that a proper construction excludes that idea. We conclude that the trust company took the note before maturity for value, in good faith, without notice of any defense thereto in the hands of the payee, and in the usual course of business. It is therefore a *bona fide* holder thereof.

Having so concluded, the issue ''that the alleged damages sustained by the district by reason of Morgan's

alleged breach of the contract should be offset against any judgment rendered against the district on the note,'' passes out of the case.   According to the undisputed testimony, the trust company took over the note before any defenses of any kind or any equities had arisen in favor of the district against Morgan growing out of the alleged breach by Morgan of the contract between them concerning the purchase of the bonds.

5.   Did the court err in rendering judgment in favor of the appellee against the National Bank impounding the funds in its hands belonging to the district for the payment of appellee's judgment against the district; and, did the court err in dismissing the interventions asking that the appellee be required to marshal the securities in its hands and resort to other securities for the satisfaction of its judgment against Morgan before resorting to the funds of the district in the hands of the National Bank?   The allegations of the petitions of the interveners (which were duly verified and not denied), taken in connection with the other testimony in the case, show conclusively that the district, at the time of the institution of this action, did not have sufficient funds on hand to pay its outstanding indebtedness.   The allegations of these interventions and the other testimony in the record also show conclusively that the improvement for which the district was created had been completed.   In this state of the record, we see no reason why the appellee was not entitled to have its judgment against the district satisfied out of the funds belonging to the district in the hands of the National Bank, for two reasons:

(a) It was the first creditor of the district to bring its action and to subject these funds belonging to the district to the payment of any judgment that it might obtain against the district.   There is no principle of equity that would postpone the appellee in the collection of its judgment out of the funds of the district and give precedence to the claims of the contractors.   On the contrary, the trust company was entitled to priority over

the interveners.    Because in the race between creditors of the district to subject its funds in the hands of the National Bank for the payment of their claims, the trust company was the first to reach the goal by instituting its action to impound such funds.

(b)  This is a direct action against the district to recover on its note, and since the work has been completed and the public is no longer interested in the preservation of the funds of the district for the completion of the improvement, and since the district has no other available funds besides those in the hands of the National Bank, the appellee had the right to resort to a court of equity to obtain a decree against the district on its note and to have equitable garnishment against the National Bank to subject the funds in its hands belonging to the district to the payment of the decree.

The funds in the hands of the National Bank belonging to the district was a trust fund, and the public interest was no longer involved in the administration of the fund.    A court of equity was the proper forum for creditors to enter in order to have these funds subjected to the payment of their claims against the district.    The appellee and the interveners were simple contract creditors of the district.    Therefore, appellee, being prior in time with its suit, had the prior lien on the funds by equitable garnishment.    See *Riggin* v. *Hilliard*, 56 Ark. 476; *Plummer* v. *School Dist. of Marianna*, 90 Ark. 236; *Bayou Meto Drainage Dist.* v. *Chapline*, 143 Ark. 446; *Henslee* v. *Mobley*, 148 Ark. 181. where principles controlling this branch of the case are announced.

The decree is in all things correct, and it is affirmed.